**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

TRACY ABRAHAM, and all 1,666 individuals                    Civil Action No.
identified in the FTCA administrative Complaint;

                    Plaintiffs,

UNITED STATES OF AMERICA,                                  **COMPLAINT**

                    Defendants,

_____/

**COMPLAINT**

**Introduction**

1.      This action is brought by all individuals identified administratively as Federal

Tort Claims ("FTCA") CLAIMANTS ("CLAIMANTS") who experienced personal and property

damage as a result of the negligence of the United States Environmental Protection Agency

("EPA") in its mishandling of the Flint Water Crisis. This action for personal and property

damages is brought against the United States of America ("USA") under the FTCA, 28 U.S.C. §

2671 *et seq.*[1]

2.      The EPA failed to follow several specific agency mandates and directives

governing its conduct which resulted in injury to the CLAIMANTS. Upon notice of a

contaminant in the water system which presents a substantial and imminent danger, the EPA is

required to first determine whether the state and local agency is taking timely action protective of

public health. If timely and protective action is not being taken, the EPA is required to bring a

Section 1431 emergency action. However, despite notice of the danger as early as October 2014,

---

[1] This action is related to three (3) cases currently pending before Hon. Linda V. Parker:
*Burgess, et al., v. United States of America*, 17-cv-11218; *Thomas, et al., v. United States of
America*, 18-cv-10243; *Adams, et al., v. United States of America*, 18-cv-13166;

the EPA failed to take the mandatory steps to determine that Michigan and Flint authorities were not taking appropriate action to protect the public from toxic water and failed to file the emergency Section 1431 action until January 2016.

3. In addition, the EPA is required to provide advice and technical assistance to states and local providers which are not in compliance with the requirements of the Safe Water Drinking Act ("SWDA") and if compliance is not achieved in thirty days, the EPA is required to issue an order or commence a civil action to obtain compliance. The EPA took none of those mandatory steps. The failure to fulfill these mandatory duties constitute violations of the FTCA.

4. An administrative claim for payment of personal and property damage in the amount of $926,112,000 million has been pending before the EPA for more than 6 months. The EPA has neither accepted nor denied the administrative claim.

**Jurisdiction, Venue, Parties and Exhaustion of Administrative Remedies**

5. This Court has subject matter jurisdiction over the USA sued pursuant to the FTCA, 28 U.S.C. § 1346(b) (1).

6. Venue is proper in cases involving tort claims against the USA where the Plaintiff resides or where the act or omission complained of occurred. 28 U.S.C.§ 1402(b); 32 C.F.R. 750.32(a).

7. Plaintiff resides in this Judicial District and the acts and omissions complained of occurred in this Judicial District.

8. On March 23, 2018, counsel filed an FTCA claim notice on behalf of 486 individuals against the EPA for personal and property damages arising out of the EPA's negligent handling of the Flint Water Crisis. These individuals shall be referred to as the **Group A Plaintiffs**. The EPA received the 486 individual FTCA notices for the Group A Plaintiffs on March 23, 2018. Each of the 486 individuals executed a written consent for representation by

2

counsel. More than 6 months has elapsed since EPA's receipt of the Claims on March 23, 2018. The EPA has not issued a Final Decision.

9.      On April 10, 2018, counsel filed an FTCA claim notice on behalf of 347 individuals against the EPA for personal and property damages arising out of the EPA's negligent handling of the Flint Water Crisis. These individuals shall be referred to as the **Group B Plaintiffs**. The EPA received the 347 individual FTCA notices for the Group B Plaintiffs on April 10, 2018. Each of the 347 individuals executed a written consent for representation by counsel. More than 6 months has elapsed since EPA's receipt of the Claims on April 10, 2018. The EPA has not issued a Final Decision.

10.      On April 19, 2018, counsel filed an FTCA claim notice on behalf of 139 individuals against the EPA for personal and property damages arising out of the EPA's negligent handling of the Flint Water Crisis. These individuals shall be referred to as the **Group C Plaintiffs**. The EPA received the 139 individual FTCA notices for the Group C Plaintiffs on April 19, 2018. Each of the 139 individuals executed a written consent for representation by counsel. More than 6 months has elapsed since EPA's receipt of the Claims on April 19, 2018. The EPA has not issued a Final Decision.

11.      On May 30, 2018, counsel filed an FTCA claim notice on behalf of 238 individuals against the EPA for personal and property damages arising out of the EPA's negligent handling of the Flint Water Crisis. These individuals shall be referred to as the **Group D Plaintiffs**. The EPA received the 238 individual FTCA notices for the Group D Plaintiffs on May 30, 2018. Each of the 238 individuals executed a written consent for representation by counsel. More than 6 months has elapsed since EPA's receipt of the Claims on May 30, 2018. The EPA has not issued a Final Decision.

12.     On June 26, 2018, counsel filed an FTCA claim notice on behalf of 177 individuals against the EPA for personal and property damages arising out of the EPA's negligent handling of the Flint Water Crisis. These individuals shall be referred to as the **Group E Plaintiffs**. The EPA received the 177 individual FTCA notices for the Group E Plaintiffs on June 26, 2018. Each of the 177 individuals executed a written consent for representation by counsel. More than 6 months has elapsed since EPA's receipt of the Claims on June 26, 2018. The EPA has not issued a Final Decision.

13.     On July 30, 2018, counsel filed an FTCA claim notice on behalf of 121 individuals against the EPA for personal and property damages arising out of the EPA's negligent handling of the Flint Water Crisis. These individuals shall be referred to as the **Group F Plaintiffs**. The EPA received the 121 individual FTCA notices for the Group E Plaintiffs on July 31, 2018. Each of the 121 individuals executed a written consent for representation by counsel. More than 6 months has elapsed since EPA's receipt of the Claims on July 31, 2018. The EPA has not issued a Final Decision.

14.     On August 22, 2018, counsel filed an FTCA claim notice on behalf of 159 individuals against the EPA for personal and property damages arising out of the EPA's negligent handling of the Flint Water Crisis. These individuals shall be referred to as the **Group G Plaintiffs**. The EPA received the 159 individual FTCA notices for the Group E Plaintiffs on August 23, 2018. Each of the 159 individuals executed a written consent for representation by counsel. More than 6 months has elapsed since EPA's receipt of the Claims on August 23, 2018. The EPA has not issued a Final Decision.

15.     These individuals, identified in Exhibit 1, are described herein collectively as CLAIMANTS.

16.     Claimants have exhausted all administrative remedies and pursuant to the FTCA are now entitled to proceed with this action in the United State District Court. 28 U.S.C. § 2675(a).

<u>**Statement of Facts**</u>

17.     This lawsuit against the EPA arises out of the environmental catastrophe known world-wide as the "Flint Water Crisis."

18.     On April 25, 2014, the Michigan Department of Environmental Quality ("MDEQ") authorized the City of Flint to distribute to its more than 30,000 customers drinking water pumped from the highly corrosive, polluted and toxic Flint River.

19.     For almost 50 years, Flint water users enjoyed plentiful, clean fresh water purchased from the Detroit Water and Sewage Department ("DWSD"). The water received from DWSD included a "corrosion–inhibiting additive, which lined pipes and connections to minimize the level of lead leaching into Drinking water." *Management Alert: Drinking Water Contamination in Flint, Michigan, Demonstrates a Need to Clarify EPA Authority to Issue Emergency Orders to Protect the Public,* Office of Inspector General, United State Environmental Protection Agency, Office of Inspector General, October 20, 2016, p 1. ("OIG")

20.     Flint Emergency Managers Edward Kurtz and Darnell Earley, with the approval of Michigan's Governor and State Treasurer, discontinued Flint's water service from DWSD and approved use of the Flint River as an interim source of water until an alternative water pipeline was completed in late 2016 or 2017.

21.     The Flint River water was toxic and 19 times more corrosive than the DWSD supplied water. The Flint River water required substantial corrosion control treatment in order for it to be safe and useable because many Flint homes and businesses have lead service lines

and plumbing making them more susceptible to high levels of corrosion and the leaching of lead.

22.     It is an undisputed fact that the MDEQ and Flint failed or refused to use corrosion control during the entire time that Flint River Water was supplied to Flint water users (April 25, 2014 to October 16, 2015). Flint water users were exposed to the toxic and highly corrosive Flint River water for 539 days or 1 year, 5 months and 21 days. OIG, p 1.

23.     Upon information and belief, certain EPA employees and/or supervisors failed to take action to preserve personal relationships with certain MDEQ employees, and for fear of causing embarrassment to such employees.

24.     On October 16, 2015, by order of the Governor, the Flint water system was re-connected to the DWSD system.

25.     Although DWSD water was restored to the Flint water system, the 539 days of exposure to highly corrosive Flint River water ruined the lead service lines, hot water tanks and other plumbing apparatus.

26.     As of November 25, 2016, the two and one half year anniversary of the switch to the Flint River, the water delivered to the people of Flint remains unsafe to drink, use for cooking or use for bathing.

27.     Throughout the spring and summer of 2014, the water supplied to Flint water users was malodorous, tasted bad and appeared to be cloudy with floating dirt or metallic particles. OIG, p 1.

28.     Flint water users received a notice in August 2014 of an acute coliform Maximum Contaminant Level (MCL), a monthly coliform MCL violation in August 2014, and a monthly coliform MCL violation in September 2014.

29.     In January 2015, Flint home owner LeeAnn Walters called the EPA regarding

6

water issues that she was experiencing at her Flint home. She informed the EPA that she and her family members were becoming physically ill from exposure to the water coming from her tap.

30.     On February 26, 2015, Crooks wrote an email to MDEQ and EPA representatives. Crooks noted that Walters complained of "black sediment in her water." Crooks noted that the iron contamination was so high that the testing instrumentation could not measure it. She went on to say:

> But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper. WOW!!!! Did he find the LEAD! **104 ppb** [parts per billion] She has 2 children under the age of 3….Big worries here ….
> -----------------------
> I think Lead is a good indication that other contaminants are also present in the tap water that obviously were not present in the compliance samples taken at the plant ….
> -----------------------
> We also talked about Dr. Joan Rose from Michigan State being on the Flint Tech Advisory committee…would want to dive further into this…she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps.

31.     In a second email on February 26, 2015, Crooks stated that Miguel Del Toral (Del Toral) of the EPA is of the opinion that the "black sediment" in Walters water was actually lead. She stated that "Miguel is wondering if Flint is feedinphosphates. Flint must have Optimal Corrosion Control Treatment-is phosphates?"

32.     Crooks continued: "From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

33.     Crooks in an email, dated February 27, 2015, offered to MDEQ representative Stephen Busch (Busch) expert advice through "our expert," Mike Schrock at EPA Cincinnati Research.

34.     On February 27, 2015, MDEQ representative Busch advised Del Toral and Crooks that "[MDEQ] will take the [offer of expert assistance] under consideration." He further stated that Flint has an "Optimized Corrosion Control Program."

35.     Del Toral, on February 27, 2015, advised Crooks that this is a very dangerous situation. He stated that "the particulate can contain very high concentrations of lead (hundreds of thousands of ppb Pb) which is much higher concentration than lead paint, so even small particles can result in high lead values."

36.     By late January 2015, the news media regularly reported the widespread water quality issues and resulting illnesses occurring in Flint. A casual internet search in January, February or March of 2015, would have produced scores of news reports about the environmental crisis developing in Flint. The EPA was monitoring these media reports.

37.     According to the OIG Report, in February, 2015, the "EPA Region 5 received the first Flint drinking water distribution system lead sampling test result, indicating a requirement of corrosion control." OIG, p 4.

38.     On March 3, 2015, Flint collected a follow-up sample at the Walters home. This time the reading was 397 ppb (more than 20 times the EPA "Action Level" of 15 ppb).

39.     On March 18, 2015, Walters informed Crooks of the March 3rd reading. Crooks asked Walters to fax her the report. She stated "any thoughts on how to respond to her? I'm running out of ideas."

40.     By March of 2015, Del Toral was communicating with Region 5 EPA personnel that there was a serious public health crisis developing in Flint caused by contaminated water.

41.     Walters also provided the EPA with reports of elevated blood lead levels for her children proving that consuming lead-laced water had poisoned her children.

42.      In early April 2015, Walters called Dr. Marc Edwards (Dr. Edwards), an environmental engineering professor from Virginia Tech University, to come to Flint to assist to address the water contamination problems. Dr. Edwards, in April 2015, took water samples and shared his test results with the EPA.

43.      On April 23, 2015, Del Toral wrote an email to the MDEQ and asked one question: "What's Flint doing now (post Detroit) for corrosion control treatment?"

44.      On April 24, 2015, the MDEQ wrote back that "Flint is not practicing corrosion control treatment at the Water Treatment Plant (WTP)."

45.      On April 25, 2015, Del Toral prepared an email to the MDEQ and his EPA colleagues stating "given the very high lead levels found at one home and the pre-flushing happening at Flint, I'm worried that the *whole town* may have much higher lead levels than the compliance indicated, since they are using pre-flushing ahead of their compliance sampling." (Emphasis added).

46.      On April 27, 2015, Del Toral travelled to the Walters home to investigate the circumstances causing the elevated lead readings. The EPA also tested neighboring homes. Ultimately, testing and investigation determined that the city-owned service line of about 25 feet running from the water main to the external shut off valve was made of lead and a source of the lead contamination. In addition, the Walters home had galvanized pipe which became "seeded" with lead due to corrosive water. According to Del Toral, the lack of corrosion control treatment was a major contributing cause for the release of lead into the Walter's water system.

47.      On May 6, 2015, the EPA returned to the Walters home to supervise the service line replacement activities.

48.      By June 2015, "EPA Region 5 had information that the city of Flint exceeded the lead level at which corrosion control was required, and that Flint was not using a corrosion

inhibitor. EPA Region 5 also had information that at least four homes had concentrations of lead in household drinking water above the action level of 15 parts per billion." OIG, p 5.

49.      On June 10, 2015, the EPA offered additional technical assistance on response managing the different water quality issues in Flint, including the presence of lead in the drinking water.

50.      On June 24, 2015, Del Toral prepared a memorandum entitled "High Lead Levels in Flint Michigan-Interim Report ("Del Toral Report")." The Del Toral Report stated that "a major concern from a public health standpoint is the absence of corrosion control treatment in the City of Flint for mitigating lead and copper levels in the drinking water." He added that "the lack of mitigating treatment is especially concerning as the high lead levels will likely not be reflected in the City of Flint's compliance samples due to the sampling procedures used by the City of Flint for collecting compliance samples."

51.      On June 25, 2015, Rita Bair ("Bair"), Branch Chief Region 5, Ground Water and Drinking Section, responded to Del Toral's Interim Report wanting to know in an email why Del Toral characterized the lead problem in Flint as "widespread."

52.      Del Toral responded to Bair via an email on Thursday June 25, 2015, stating that:

> The widespread high lead is my judgement based on a couple of decades of working with lead issues and I stand by it despite the limited data set from Flint. A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that there is a problem there. They have had no corrosion control treatment in place for over a year now and they have lead service lines. It's just basic chemistry on lead solubility. You will have high lead leaching into the water where you are doing nothing to mitigate that. We don't need to drop a bowling ball off every building in every town to know that it will fall to the ground in all of these places….The only reason we don't have more data is because the City of Flint is flushing away the evidence before measuring for it…there is zero chance or close to zero chance that you will ever capture any of the high lead…. the high lead levels we are seeing in Flint are mainly particulate lead, which is released sporadically in most cases, so unfortunately for

Flint in their attempts to avoid capturing lead, these particles are being captured despite their attempts not to capture lead. **I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed. At a MINIMUM, the City should be warning residents about the high lead, not hiding it telling them that there is no lead in the water. To me that borders on criminal neglect**. The only people that question the science are the ones that have a vested interest in not finding lead. When we look, we find it. When they look, they either don't find it or if they find it, they dismiss it as the resident's plumbing or use some other fabricated reason (emphasis added).

53.     Sometime between June 24, 2015 and June 30, 2015, Del Toral provided his Interim Report to Walters who shared it with Curt Guyette (Guyette) an investigative reporter with the ACLU of Michigan.

54.     Guyette confirmed the accuracy of the Del Toral Report by interviewing Del Toral who confirmed that the assertions contained in the Report were accurate.

55.     Guyette then approached Flint for comment. On June 30, 2015, Mayor Dwayne Walling (Walling) notified EPA Region 5 Director Dr. Susan Hedman (Hedman) that an EPA Region 5 staff member was speaking publicly about the Flint environmental crisis.

56.     On July 1, 2015, Hedman informed Walling that the Del Toral Report "should not have been released outside the agency." She recommended to Walling that Flint retain two EPA experts on lead and drinking water and that Flint follow the lead of the MDEQ. Walling asked Hedman to advise the ACLU that Flint should follow the advice of the MDEQ.

57.     On July 2, 2015, Hedman said to Walling that "I am not inclined to have any further communication with the ACLU representative." She told Walling that he could tell Guyette that what he was given was a preliminary draft and that it would be premature to draw any conclusions based on that draft."

58.     On July 9, 2015, Michigan media outlets raised the serious environmental and public health issues discussed in the Del Toral Report---the serious issues which had been well

known to the EPA from January, 2015. The threat to the public health of the citizens of Flint became nationwide news.

59.     On July 10, 2015, in response to the media reports of a public health crisis in Flint, Hedman issued a press statement which stated in part that the "EPA will work with the Michigan DEQ and the City of Flint to verify and assess the extent of lead contamination issues and to ensure that Flint's drinking water meets federal standards."

60.     On July 14, 2015, Guyette asked the EPA if phosphate should be used as corrosion control. Although the answer to this question is an unequivocal "YES," the EPA provided an evasive and convoluted response in an apparent desire to protect the MDEQ. When Guyette asked the EPA to comment on whether the sampling methods were minimizing the lead readings, the EPA again provided an evasive response.

61.     On July 21, 2015, EPA representatives had a conference call with MDEQ representatives. The MDEQ argued with the EPA about the necessity of immediate corrosion control treatment in light of what it alleged was "compliant sampling." The EPA was concerned about the validity of the MDEQ position, because the EPA had doubts as to whether the sampling was done properly.

62.     At the July 21, 2015 meeting, the EPA informed the MDEQ that Flint should be instructed to "start corrosion control treatment as soon as possible." The MDEQ acknowledged that it had already been in contact with the EPA's experts (Lytle and Shock). The EPA did not establish any deadlines for the commencement of corrosion control.

63.     On August 10, 2015, EPA representatives asked the MDEQ for an update on the status of the corrosion control treatment. No information was forthcoming.

64.     On August 17, 2015, MDEQ sent a letter to Flint recommending that Flint

implement corrosion control treatment as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months.

65.    On August 28, 2015, the EPA asked the MDEQ to provide Flint's corrosion control compliance plan.

66.    On August 31, 2015, the MDEQ disputed that corrosion control was necessary because its sampling establishes compliance.

67.    On August 31, 2015, Dr. Edwards published the results of his water testing and reported that 20% of the samples were over the 15 ppb EPA Action Level. Dr. Edwards' report showed that 42% of the tested Flint homes had levels of 5 ppb or higher.

68.    On August 31, 2015, the EPA and MDEQ engaged in a conference call to respond to Dr. Edwards' report of an emerging major public health crisis. The EPA suggested that the participants could discredit Dr. Edwards' findings because his labs were not "certified." The EPA noted that Dr. Edwards' website "is putting added pressure on the MDEQ and EPA to ensure that Flint addresses their lack of optimized corrosion control treatment in an expedited manner in order to protect the residents from exposure to high lead levels." The EPA acknowledged in this call that "to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's many lead service lines are continuously in contact with corrosive water."

69.    In September 2015, EPA Region 5 first briefed the EPA Headquarters' Office of Enforcement and Compliance Assurance ("OECA") about Flint's water crisis.

70.    The OECA immediately advised the Region take Safe Drinking Water Act ("SDWA") Section 1431 action (Emergency Administrative Order). However, Region 5 did not issue an Emergency Administrative Order, as directed by OECA, until January 21, 2016.

71.     On September 3, 2015, media reports indicated that Dr. Edwards' reports showed that there is an immediate public health crisis at hand. The media reported that the highly corrosive Flint River water was causing lead contamination in Flint homes. The media reported that the corrosion control plan would be implemented in January, 2016.

72.     On September 9, 2015, Jessica Dupnack (Dupnack) of ABC *Channel 12* asked the EPA if "there is any warning to citizens about drinking the water?" Peter Cassell (Cassell), Press Officer of the EPA, misleadingly stated that the "lead monitoring shows Flint has not exceeded the lead action level …." Cassell further added that "Flint recently accepted EPA's offer to provide technical assistance to the City and MDEQ …."

73.     Later that day, Dupnack asked Cassell to comment on the disparity between Flint's position (the City is in compliance) and Dr. Edwards' position (the City testing is invalid). She asked if the EPA's position is that "every single home falls below 15 ppb?" Cassell evaded the question by responding "I'm not sure how the sampling differs between the City of Flint and Virginia Tech and can't comment on that, specifically."

74.     On September 9, 2015, Congressman Dan Kildee asked the EPA:

    a.   if the findings in the Del Toral Report were accurate;

    b.   if there was a public health emergency;

    c.   when will the EPA tell citizens about the public health concerns; and

    d.   most importantly, is the water safe?

75.     On September 15, 2015, Susan Hedman provided a vague response to Congressman Kildee's correspondence. She did not address any issues that Kildee had raised regarding the accuracy of the Del Toral report.

76.     On September 11, 2015, Crooks wrote to MDEQ representatives and stated: "Just to clarify; on our call, I wanted to remind you that Miguel's report had DEQ cc'd. So if the

14

Legislature or whoever might say you all were cc'd, you can truthfully respond that it was EPA's request that the report not be sent to the ccs. Consequently, you all never received the report from Miguel." Crooks was fully aware that the MDEQ representatives had received the report, not from the EPA but rather from the public media when Guyette published his story about the Del Toral report.

77.     On September 14, 2015, Debbie Baltazar, Water Division Branch Chief for EPA Region 5, wrote a disturbing email, which stated that "perhaps [Hedman] already knows all of this, but I am not sure Flint is the community we want to go out on limb for."

78.     On September 18, 2015, EPA Director of Water Division, Tinka Hyde, made a formal request for EPA experts Lytle and Schock to be assigned to Flint to provide technical assistance.

79.     On September 20, 2015, Dr. Edwards sent an email to Lytle and Schock and other EPA officials. In this email, Dr. Edwards made a strong case that the

Flint/MDEQ prior sampling should be rejected as non-compliant with basic testing protocol.

He completed his communication by pointing out emphatically that:

1)     FLINT HAS LOTS OF LEAD PIPE, NO CORROSION CONTROL TREATMENT, AND HAS NO LEGITIMATE LCR TESTING FOR AT LEAST A YEAR.

2)     AMONGST LOW INCOME INFANTS, BREAST FEEDING RATES ARE LOWER, AND FORMULA USE IS HIGHER. MANY FLINT RESIDENTS CANNOT AFFORD TO FLUSH DUE TO HIGH WATER RATES, THEY CANNOT AFFORD BOTTLED WATER. THIS IS AN UNPRECEDENTED SITUATION AND EPA NEEDS TO TAKE THIS SERIOUSLY, NOW.

3)     WE HAVE ONE CHILD WITH ELEVATED BLOOD LEAD ALREADY….IN FACT, THAT IS THE ONLY REASON WE KNOW ABOUT ANY OF THE ABOVE.

4)     MDEQ IS STILL PUBLICLY INSISTING FLINT WATER HAS TESTED SAFE, IS SAFE, AND THAT FLINT HAS **NO VIOLATIONS**

OF ANY SORT (emphasis in original).

80.     Dr. Edwards continued: "I believe that someone at HQ or in R5 should immediately take decisive action on this issue to protect the public."

81.     On September 21, 2015, Dr. Edwards published on his website his advice to Flint water users: "Drink or cook with the water only if a proper filter is used and flushing for 5 minutes before the water is used for drinking or cooking. Dr. Edwards shared this information with the EPA. The EPA responded by stating that the agency is "looking into the information you have provided." Elected Officials met with EPA and MDEQ representatives to review the situation and options.

82.     On September 21, 2015, Dr. Mona Hanna-Attisha presented her study of elevated blood lead levels for children in Flint to Walling, Natasha Henderson, City Administrator and Howard Croft, Director of Flint Public works. In her report, Dr. Hanna-Attisha documented increases which coincided with the exposure to the Flint River water. Dr. Edwards shared this information with the EPA.

83.     Dr. Edwards also informed the EPA that Dr. Hanna-Attisha reported, that the EPA had given the City of Flint a "blessing that they were in compliance and there was no corrosivity" issue. Dr. Hanna-Attisha pushed for a health advisory to be published to the citizens of Flint.

84.     On September 22, 2015, Dr. Edwards wrote an email to the EPA stating:

> MDEQ will go to their graves insisting Flint has met all Federal LCR standards…higher numbers of EBL kids be damned. They are also telling people that EPA has said that there is no absolutely no corrosion problem in Flint water.

85.     On September 24, 2015, Dr. Mona Hanna-Attisha held a press conference to release her study and recommendations. Her position was dramatic: every child in Flint is presumed to have ingested lead and has been harmed by this toxic metal.

86.     On September 25, 2015, the City of Flint issued a lead advisory which states in part:

> The City of Flint is issuing a lead advisory for residents to be aware of lead levels in drinking water after hearing concerns from the medical community. While the City is in full compliance with the Federal Safe Drinking Water Act, this information is being shared as part of a public awareness campaign to ensure that everyone takes note that no level of lead is considered safe.

87.     On September 27, 2015, Hedman called MDEQ Director Dan Wyant and discussed the need for expedited implementation of corrosion control treatment.

88.     On October 1, 2015, the Genesee County Health Department issued a "Do Not Drink the Water" Advisory. The Natural Resources Defense Council on behalf of Dr. Edwards, Coalition for Clean Water, and Concerned Pastors for Social Action and other interested groups and individuals filed a Petition for Emergency Action against the EPA to force the EPA to take action to abate the imminent and substantial endangerment to the health of Flint residents.

89.     On October 8, 2015, the Governor announced that he had ordered the restoration of DWSD water to the Flint water system.

90.     On November 4, 2015, the Del Toral Report was finalized. The report noted that officials were implementing many of the recommendations contained in the Interim Report (Flint was switched back to Detroit water, filters were provided to residents and additional corrosion control was to be implemented).

91.     On January 16, 2016, the Governor declared a state of emergency.

92.     On January 21, 2016, the EPA issued its Emergency Administrative Order pursuant to Section 1431 of the Safe Drinking Water Act, 42 U.S.C.§ 300i stating in part:

> The presence of lead in the City water is principally due to lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014. The river's water was corrosive and removed protective coating in the system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized.

The City, MDEQ and the State have failed to take adequate measures to protect public health….there continue to be delays in responding to critical EPA recommendations…the EPA remains concerned that the City lacks the professional expertise and resources needed to carry out the recommended actions and to safely manage the City's PWS.

93.    On March 17, 2016, EPA Administrator McCarthy testified before Congress. She appeared before House Oversight and Government Reform Committee and admitted that the EPA tried but could not achieve corrosion control in a timely manner. Chairman Representative Jason Chaffetz asked her: "when did you know they [MDEQ] didn't do [corrosion control]?" McCarthy said that:

[W]e [EPA] knew on July 21st of a systemic problem. The state [MDEQ] agreed the next day and then all they did was slow walk [corrosion control]. That's why we had to do it the way we did. I wished we had gone further. I wish we had gone farther. I wished we had yelled from the tree tops but there is no way that my agency created this problem or there was ambiguity in the law that wouldn't have done the same that the governor said. Don't put people at risk just because we couldn't figure out in the life of us, in our guidance, we never thought anybody goes from a treated system to an untreated system and not treat it [with corrosion control ]. I didn't think we ever had to say that because I never thought anyone would. That's where we are today.

94.    On October 20, 2016, the OIG report was issued which stated in part that

*EPA Region 5 had the authority and sufficient information to issue a SDWA Section 1431 emergency order to protect Flint residents from lead- contaminated water as early as June 2015. Region 5 had information that systems designed to protect Flint drinking water from lead contamination were not in place, residents had reported multiple abnormalities in the water, and test results from some homes showed lead levels above the federal action level.*

EPA Region 5 did not issue an emergency order because the region concluded the state's actions were a jurisdictional bar preventing the EPA from issuing a SDWA Section 1431 emergency order. However, the EPA's 1991 guidance on SDWA Section 1431 orders states that if state actions are deemed insufficient, the EPA can and should proceed with a SDWA Section 1431 order, and the EPA may use its emergency authority if state action is not protecting the public in a timely manner. However, EPA Region 5 did not intervene under SDWA Section 1431, the conditions in Flint persisted, and the state continued to delay taking action to require corrosion control or provide alternative drinking water supplies."

OIG Report, "At a Glance".

## COUNT I
### NEGLIGENCE – Failure to take mandatory actions required by SWDA

95.     The United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner and to the same extent as a private individual under like circumstances*. 28 U.S.C. § 2674.

96.     All of the events which give rise to this cause of action occurred in the state of Michigan.

97.     The EPA is liable for the knowledge of and acts and omissions of its agents and employees, including but not limited to, Jennifer Crooks and Dr. Susan Hedman.

98.     This case involves a major failure of all levels of government to protect the health and safety of the public. Local, state and federal agencies and employees, working individually and at times in concert with each other, mismanaged this environmental catastrophe.

99.     The EPA undertook the duty of rendering services to the MDEQ "for the protection" of the Flint water users.

### A.     Failure to Issue § 1431 Emergency Order

100.     Upon learning that a contaminant which is present or likely to enter a water system may present a substantial and imminent danger to the health of persons and that the actions of state and local authorities have not been sufficient, the EPA was required to issue a § 1431 emergency order.

101.     An order issued pursuant to §1431 can require state and local officials to take actions to protect the public including providing alternative water supplies at no cost to the consumer as well as public notification of the hazard.

102.     Despite learning as early as October 2014 that Flint water users were being

exposed to a substantial and imminent danger due to a contaminant in the water system about which the Michigan and Flint officials had failed to take sufficient actions to remedy, the EPA failed to fulfill its mandatory duty to issue a § 1431 emergency order. This failure persisted until January 2016.

**B.     Failure to Provide Technical Assistance, Obtain Compliance and Commence Civil Action Under § 1414**

103.    Pursuant to § 1414 of the SWDA, when the EPA learns that state or local water provider has not complied with the requirements for safe drinking water, the EPA must provide expert advice and technical assistance. If compliance is not obtained within 30 days, the EPA must issue an order requiring the public water system to comply or commence a civil action.

104.    The EPA had notice that the Flint water system was not in compliance with the requirements of the SWDA as early as October 2014.

105.    Despite notice of non-compliance in October 2014, the EPA did not provide advice and technical assistance until September 2015 and never issued an order or commenced a civil action to require the State of Michigan or the City of Flint to bring the Flint water system in compliance with the requirements of the SWDA as required by § 1414.

**C.     Negligent Undertaking Regarding Corrosion Control**

106.    In February, 2015, the EPA rendered service to the MDEQ and responded to LeeAnn Walters' complaints about being exposed to contaminated Flint River water.

107.    Upon undertaking this task, the EPA owed a duty of reasonable care to prevent or reduce the risk of harm to Walters and the other CLAIMANTS.

108.    The Statement of Facts recited above establishes that the EPA was an active participant in the mismanagement of the unfolding environmental disaster.

109.    Crooks was aware that the Flint River was highly corrosive and that Flint had

older corroded lead service pipes which required corrosion control treatment. She knew in February 2015, that Del Toral observed lead based "black sediment" in the Walters water.

110.    Crooks in February 2015 was aware that exposure to the Flint River water was causing skin rashes and falling clumps to hair from a family member of the Flint Tech Advisory Board.

111.    In February 2015, EPA agent Del Toral informed Crooks that the absence of corrosion control treatment provided a possible explanation for the presence of lead particles floating in the water.

112.    Based on the facts supplied by Del Toral, Crooks knew or should have known that corrosion control treatment was essential for safe distribution of the Flint River water and that this treatment was probably absent from the treatment of the water.

113.    By April 25, 2015, the EPA was positive that corrosion control was not being used yet failed to suggest, direct or counsel the MDEQ and Flint to implement a corrosion control program until July 2015.

114.    By April 2015, this probability became a certainty and the EPA had a firm and clear knowledge that the MDEQ either refused or was incapable of managing the technical aspects that ensured that all environmental laws were adhered to.

115.    Even after the EPA directed the MDEQ and Flint to implement corrosion control in July 2015, the EPA knew that the MDEQ and Flint "slow walked" the process as testified to by EPA Administrator McCarthy on March 17, 2016.

116.    EPA Region 5 had the authority and sufficient information to require the issuance of a SDWA Section 1431 emergency order to protect Flint residents from lead contaminated water as early as October 2014.

117.    Region 5 had information that systems designed to protect Flint drinking water from lead contamination were not in place, e.g. residents had reported multiple abnormalities in the water, and test results from some homes showed lead levels above the federal action level.

118.    In September 2015, EPA Region 5 finally briefed the EPA headquarters' Office of Enforcement and Compliance Assurance (OECA) about Flint's water crisis.

119.    OECA immediately advised the region take SDWA Section 1431 action. During the fall, the state began to take actions to correct the problems in Flint. EPA Region 5 maintained that the state was acting, but the contamination continued. The EPA Administrator finally directed OECA to issue an emergency order on January 21, 2016. The emergency order stated the EPA had determined that Flint's and Michigan's responses to the drinking water crisis were inadequate, and the EPA ordered specific actions to address a public health threat.

120.    The failure of the EPA to comply with its duty under both § 1414 and §1431 of the SWDA, to issue a section 1431 emergency order, to provide advice and technical assistance to obtain compliance with the requirements of the SWDA and to issue an order or commence an action against state and local officials to obtain compliance including requiring immediate corrosion control treatment was unreasonable and unquestionably increased the risk and level of harm to CLAIMANTS.

121.    The EPA, in rendering services to the MDEQ, undertook the duty owed by the MDEQ to CLAIMANTS.

122.    The EPA breached this duty to CLAIMANTS when it unreasonably delayed in requiring Flint to promptly implement corrosion control and in failing to promptly notify Flint water users of the contamination of the water supply and the hazardous situation.

**COUNT II**
**Negligent Performance of Undertaking Regarding Timely Investigations**

123.    The EPA received complaints and notices of violations in connection with Flint residents' exposure to poor quality water caused by the distribution of the highly corrosive Flint River water.

124.    The EPA undertook the obligation to timely investigate complaints and in so doing imposed upon itself a duty to investigate the complaints in a careful and reasonable manner so that once violations of law or regulation were detected a proper and prompt remedy could and would be pursued.

125.    CLAIMANTS relied on the EPA to undertake the task of investigating complaints and fashioning the appropriate remedy.

126.    If the investigation had been undertaken in a timely fashion, a violation of environmental law would have been detected and City of Flint would have been required to implement corrosion control treatment or to develop another remedy to prevent harm to CLAIMANTS.

## COUNT III

### Negligent Undertaking of the Duty to Warn the Public of Environmental Risks to Public Health

127.    The EPA, in employing environmental safety experts such as Del Toral, undertook the task of providing the MDEQ with environmental safety technical advice and expertise regarding the consequences of using the Flint River as a primary drinking water source.

128.    On June 24 and 25, 2015, Del Toral advised the EPA the public's exposure to lead was "widespread" and that the environmental catastrophe facing Flint should not be concealed and the citizens must be warned of the public health and safety risks.

129.    Yet the EPA concealed from the public the environmental dangers and risks and the failure to immediately warn them of the public of the public health emergency bordered on

"criminal neglect."

130.    Notwithstanding this advice from its expert as to how to implement a mitigation of harm plan, the EPA remained silent when it should have spoken out and it knowingly permitted and facilitated the MDEQ and City of Flint in the concealment of the environmental disaster identified by Del Toral.

131.    The failure to warn CLAIMANTS and the citizens of Flint of the environmental disaster and ensuing cover-up significantly increased the harm to the Citizens of Flint for which the EPA is responsible.

## DAMAGES

132.    As a result of the EPA's negligence, CLAIMANTS have experienced and will continue to experience physical injury, illness, lead poisoning, dermatological disorders, loss of hair, gastrointestinal disorders, out of pocket economic losses; CLAIMANTS have experienced and will continue to experience pain and suffering, emotional distress, deprivation of a quality of life; CLAIMANTS have experienced property damage to real estate and personal property; CLAIMANTS have experienced a loss of property value.

Dated March 4, 2019                              Respectfully submitted,

                                                 Hunter Shkolnik
                                                 Paul J. Napoli
                                                 NAPOLI SHKOLNIK PLLC
                                                 360 Lexington Avenue, 11th Floor
                                                 New York, NY, 10017
                                                 Tel: (212) 397-1000
                                                 hunter@napolilaw.com
                                                 pnapoli@napolilaw.com